## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | |
|---|---|
| **GARY WILSON**, | |
| Plaintiff**,** | |
| v. | Case No. _____ |
| **SHELL OIL COMPANY, SHELL EXPLORATION & PRODUCTION COMPANY, AND SHELL ENERGY RESOURCES COMPANY**, | |
| Defendants. | |

## COMPLAINT

This action involves claims for religious discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. § 2000e-2 *et seq.*  Plaintiff Gary Wilson ("**Wilson**" or "**Plaintiff**"), by and through his attorneys, alleges as follows:

## INTRODUCTION

1.      In the Fall of 2021, Defendant Shell Oil Company made a determination that its employees should be vaccinated against the COVID-19 virus.  This included employees in its subsidiaries, including those in Shell Oil (Shell USA), Shell Exploration & Production Company, and Shell Energy Resources Company ("**Shell**" or "**Defendants**").  While Shell provided exemption request documents, the company did not plan to allow certain disfavored employees to have reasonable accommodations—as required under Title VII—from its vaccine mandate.

2.      Shell decided instead that it could rely on the argument that it would be an "undue hardship" to allow unvaccinated employees like Mr. Wilson to continue working for the

1

company—an unsupportable claim.  Especially when other similarly-situated employees were accommodated.

3.      The company allowed Mr. Wilson to continue working with a "temporary accommodation" during the first part of 2022 (continuing to work unvaccinated while the new Omicron variant infected both vaccinated and unvaccinated individuals alike).

4.      But then, on May 20, 2022—months after the Omicron variant had dispelled most people of the illusion that COVID-19 vaccines were capable of preventing infection and transmission (and should be mandated at all), and months after other companies across the country had retracted their vaccine mandates—Shell fired Mr. Wilson for refusing to take the vaccine for religious reasons.

5.      Meanwhile, similarly-situated employees—including individuals working on the same offshore "asset" of Shell as Mr. Wilson—were allowed to continue working unvaccinated, whether for medical reasons, religious reasons other than Mr. Wilson's, or some unknown reason.

6.      Setting aside the fact that the overwhelming majority of U.S. based companies managed to navigate the COVID-19 pandemic without instituting a vaccination mandate, there were a multitude of no-cost accommodation options available in Mr. Wilson's specific case (including ones the company had policies in place to use and ones that were used for other employees).

7.      Indeed, Shell evidenced religious discrimination equally by refusing to recognize that Mr. Wilson had already been immunized naturally.  As one district court has noted, "when . . . millions of people have already been infected, developing some form of natural immunity, and when people who have been fully vaccinated still become infected, mandatory vaccines as the only

method of prevention make no sense." *Louisiana v. Becerra*, No. 3:21-cv-03970-TAD-KDM, slip op. at 27 (W.D. La. Nov. 30, 2021).

8.      As the CDC recognized around the same time Shell instituted its mandate, individuals with natural immunity have a greater resistance to the virus than individuals who have been vaccinated alone.[1]  Mr. Wilson's prior infection was thus superior to a vaccination primary series and there was no need to force him into a medical treatment that violated his faith.

9.      And Shell was well aware of this fact before ploughing ahead and terminating him. In January 2022, Counsel sent a letter to Shell, alerting the company to the CDC's position and outlining multiple costless accommodations that the company could have used.[2]

10.     This demonstrates that Shell knowingly chose to ignore the available options and act adversely against Mr. Wilson despite the evidence and common understanding in the Spring of 2022 that vaccine mandates were ineffective in addition to being draconian.

11.     To be sure, finding reasonable accommodations for vaccine mandates was not unique to Shell.  But Shell's actions were in stark contrast to the vast majority of employers that instituted vaccine mandates.  Indeed, most hospitals and even vaccine manufacturers managed to seamlessly follow federal law when implementing their new policies, providing reasonable accommodations to employees entitled to exemptions.  Those companies recognized early, and certainly by May of 2022, that the available vaccines were ineffective at eliminating transmission of COVID-19.  Recognizing the value of maintaining their existing workforces, in conjunction with the scientific realities of already demonstrated vaccine inefficacy, these companies either

---

[1] *See* CDC, *COVID-19 Cases and Hospitalizations by COVID-19 Diagnosis—California and New York, May–November 2021* ("**CDC Report**"), https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm?s_cid=mm7104e1_w (noting that "[b]y October [of 2021], persons who survived a previous infection had lower case rates than persons who were vaccinated alone").

[2] *See* Exhibit 1, Letter from J. Sullivan to C. Hirstius (Jan. 25, 2022).

chose not to enforce their respective mandates, or otherwise accommodated their exempt employees.

12.     For instance, vaccine manufacturer Johnson & Johnson ("**J&J**") allowed its exempt salespersons to wear a mask when visiting doctor's offices, etc. as a reasonable accommodation from its vaccine mandate.  As one example of many, Donn Arizumi—a J&J sales representative from Hawaii—was provided a reasonable accommodation for his religious beliefs.  In fact, though Mr. Arizumi is unvaccinated, he would visit primary care doctors, oncologists, and cardiologists on a daily basis while working for Janssen, one of the companies that makes COVID-19 vaccines. When Mr. Arizumi asked for an accommodation to J&J's vaccine mandate, rather than make him uncomfortable about his beliefs, the company merely asked for a letter explaining his position.  He was then granted the straightforward accommodation of not taking the vaccine and just continuing to wear a mask when visiting client offices.  There was no hassle; no phone calls from management to coerce him into taking the shot; no search for legal arguments the company might later be able to use against him; no holding his livelihood over his head.  Merely a leader in the health care industry following federal law and providing a reasonable accommodation to its exempt employee.[3]

13.     Even companies that assumed (incorrectly) the vaccines were preventing transmission were willing to recognize that regular testing would mitigate any concern over employees remaining unvaccinated.  After all, employees without an active COVID-19 infection certainly *could not* transmit COVID-19, regardless of their vaccination status.  Shell instead chose to place itself amongst the small minority of companies that terminated religious employees over their beliefs.

---

[3] *See* Exhibit 2, Declaration of Donn Arizumi (Oct. 8, 2022).

14.     Mr. Wilson was captured in the net of Shell's discriminatory policies.  He submitted a clearly articulated religious exemption request, explaining fully how his religious beliefs precluded him from receiving a COVID-19 vaccine.  After pointlessly following up with Mr. Wilson to see which denomination of Christian he was, Shell apparently conceded the sincerity of his religious beliefs that prevented vaccination but denied his request for an accommodation.[4]

15.     Shell denied Mr. Wilson's accommodation request on unsupported grounds that it would be an "undue hardship in the form of safety and costs related to the spread of COVID-19 on [Shell's] offshore assests" for Shell if he remained unvaccinated.  The company refused to consider either Mr. Wilson's natural immunity (that the CDC had said was at least as strong as vaccine-induced immunity) or his willingness to test for COVID-19 prior to any trips to Shell's offshore assets.  Unsurprisingly, no company has yet to explain how someone without COVID-19 can transmit COVID-19.

16.     And, on information and belief, by the time Shell fired Mr. Wilson in May of 2022, the company knew that the vaccine had been ineffective at preventing the spread of the Omicron variant of COVID-19 throughout the Winter of 2021 and Spring of 2022.  In fact, the company knew that COVID-19 was being spread on its offshore assets when it denied Mr. Wilson's accommodation request in December of 2021 even though most of its employees were already vaccinated.[5]

---

[4] *See* Exhibit 3, Religious Accommodation Denial Email from Shell Employee Relations (Dec. 28, 2021).

[5] Any immunity derived artificially through vaccination has been demonstrated to wane dramatically. Indeed, research from one of the world's most prestigious medical institutions—the Cleveland Clinic—has demonstrated that the risk of contracting COVID-19 *increases with the number of vaccine doses received.* Nabin K. Shrestha *et. al.,* MedRxiv, *Effectiveness of Coronvirus Disease (COVID-19) Bivalent Vaccine,* (Dec. 19, 2022), *available at* https://www.medrxiv.org/content/10.1101/2022.12.17.22283625v1 (finding, in comprehensive study, that the risk "of COVID-19 increased with time since the most recent prior COVID-19 episode **and with the number of vaccine doses previously received**" (emphasis added)).

17.     And certainly, Shell knew that forced vaccinations were inappropriate by late February of 2022 when it made the determination that its "United States COVID-19 Incident Management Team (IMT)" was no longer necessary and would be "demobilized on March 3, 2022."[6]

18.     Tellingly, Shell *did* provide reasonable accommodations to other employees who were similarly situated to Mr. Wilson.  Select employees on the Perdido—the name of the offshore asset where Mr. Wilson worked—were allowed to continue working without a COVID-19 vaccination as well as other offshore workers in the "Pipeline" division whose working conditions were quite similar to Mr. Wilson's.

19.     While complexities should be expected when a private employer chooses to roll out a forced medical treatment regime, a company cannot recklessly impose an onerous new employment requirement without proper consideration of how to accommodate religious and disabled employees who would undoubtedly be affected by such a policy.  Imposing such a requirement, and then shrugging shoulders and asserting "undue hardship"—despite knowing the impact it would have on the workforce—is hardly a choice an employer is entitled to make.

20.     Shell has no legitimate claim that it would have been an undue burden to accommodate Mr. Wilson because Shell manufactured its own burden in the first place, and then continued to insist on irrationally shouldering that burden at a time when it was clear that the dominant COVID-19 variant (Omicron) was significantly less severe and at a time when vaccine *in*efficacy against the Delta and Omicron variants was crystal clear.

21.     More importantly, though, is that instead of legitimately considering costless options with the goal of accommodating Mr. Wilson, Shell leveraged people's livelihoods against

---

[6] *See* Exhibit 4, Email from G. Watkins (Mar. 1, 2022).

their faith in order to further advertising or virtue signaling or rank discrimination goals. Shell ignored costless ways around its theoretical and self-imposed burden when it came time to follow federal employment law.

22.     Just because Shell claims something to be an "undue burden" does not make it so. While the company may now *claim* a burden in accommodating Mr. Wilson, that claim cannot be *demonstrated* (which is Shell's burden) because the evidence does not support it.

**PARTIES**

23.     Mr. Wilson is a resident of Pennsylvania who worked for Shell Oil Company in the Gulf of Mexico based out of South Texas. Specifically, he would report to Galveston for his "hitches" (helicopter rides) to the offshore asset where he worked. Mr. Wilson was with the company for over a decade, working most recently as an Operations and then Maintenance supervisor on the "Perdido" asset in the Gulf since November 1, 2020. The Perdido sits directly south of Galveston in the Gulf of Mexico.[7]

24.     Shell Oil Company (or Shell USA, Inc.) is the United States-based subsidiary of Shell plc and is headquartered in Houston, Texas.

25.     Shell Exploration & Production Company (SEPCO) is a subsidiary of Shell Oil and is headquartered in Houston, Texas.

26.     Shell Energy Resources Company, a subsidiary of SEPCO that oversees Shell's operations in the Gulf of Mexico, is a foreign for-profit corporation registered in the State of Texas with offices in New Orleans, Louisiana.[8]

---

[7] *See* Exhibit 5, Map of Shell Assets in the Gulf of Mexico, *available at* https://www.shell.us/energy-and-innovation/energy-from-deepwater.html.

[8] The registered agent for all three Defendants is CT Corporation System in Dallas, Texas.

## JURISDICTION AND VENUE

27.    This Court has original jurisdiction of this action pursuant to 28 U.S.C. §1331 as one arising under laws of the United States.

28.    This Court has jurisdiction over the related state law claim under 28 U.S.C. § 1367(a).

29.    Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. § 2201.

30.    Venue is proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the "unlawful employment practice[s]" giving rise to this lawsuit took place within this district.  Mr. Wilson worked for Shell based out of this district and this division; he would have continued to do so if not for the company's unlawful actions.

## FACTUAL ALLEGATIONS

### A.  General Background

31.    In March 2020, the Severe Acute Respiratory Syndrome Coronavirus 2 ("**SARS-CoV-2**") prompted the institution of worldwide lockdowns and limitations on in-person interaction to slow the spread of the disease now known as COVID-19.

32.    On March 13, 2020, President Donald J. Trump declared a national emergency relating to the COVID-19 pandemic.  In response, many state and local governments issued "Stay at Home" orders for all non-essential workers, urging residents only to leave their homes for necessities.

33.    Shell's workers were deemed to be essential, however, and continued working throughout the pandemic.

34.    Mr. Wilson excelled during this time, consistently obtaining the highest marks in his yearly reviews.  He also moved during the pandemic from a Maintenance Supervisor at the

8

Appalachia Field Operations to an Operations Supervisor and then Maintenance Supervisor on the "Perdido" offshore asset for Shell.  While Shell technically characterizes both of those moves as lateral, they were more lucrative positions and preferable opportunities.

35.     As evidenced by his advancement in the company and his annual employment records that earned him above-average annual bonuses each year, Mr. Wilson possessed an exceptional performance record.  Indeed, Mr. Wilson received Shell stock for the year 2021 as a performance bonus from his exceptional performance during the pandemic.

### B. Shell's Vaccine Policy and Mr. Wilson's Request for a Religious Accommodation

36.     In November of 2021, Shell issued its COVID-19 vaccination policy, indicating that it would require employees to be fully vaccinated by January 1, 2022 (the "**Policy**").

37.     Shell management repeatedly asserted throughout the relevant timeframes, through word and action, that the available COVID-19 vaccines were effective at preventing transmission of the virus and that the Policy was necessary to ensure workplace safety.  While absolute vaccine necessity was always a dubious proposition, the inefficacy of the vaccines at preventing the contraction and transmission of COVID-19 became increasingly clear in the months of November and December of 2021 as the Omicron variant became dominant.  Yet, Shell continued to insist that its religious employees, like Mr. Wilson, either surrender their beliefs or lose their jobs.

38.     On information and belief, Shell's own records will likely demonstrate that the company was aware that the vaccines mandated by the Policy were not effective at stopping transmission of the virus during the relevant timeframes.

39.     The costs Shell will attempt to attribute to unvaccinated religious employees—such costs to medivac employees who contracted COVID-19 off an oil rig, testing, or other enhanced safety protocols—were more heavily attributable to vaccinated employees, who were contracting

9

COVID-19 at higher rates during the relevant timeframes than to unvaccinated religious employees who, like Mr. Wilson, possessed natural immunity against COVID-19.

40.     The Policy allowed employees to request religious accommodations from the mandate.  Shell provided an "Application for Religious Accommodation Related to COVID19 Vaccination" (the "**Form**") for those seeking religious accommodation, to complete and submit before the forced vaccination deadline.[9]

41.     Mr. Wilson submitted his Form on November 3, 2021, explaining his sincere religious beliefs that precluded him from receiving the COVID-19 vaccine.[10]

42.     Mr. Wilson outlined in his submission the multiple religious reasons he had for being unable to receive the vaccine.  Among these were (1) specific guidance from the Bible regarding divine healing and direction from God through prayer; and (2) the use by vaccine manufacturers of fetal stem cell lines in the development and production of the COVID-19 vaccines.[11]

43.     After submitting the form, Mr. Wilson was contacted by Shell to assess the sincerity of his religious accommodation request (with what appears to be a portion of a form email the company could use to delve into employees' beliefs).  The company only really wanted to know one thing, though: the Christian denomination to which Mr. Wilson belongs.[12]

44.     These types of inquiries are inappropriate well beyond the limited inquiry advised by the EEOC for addressing religious beliefs.[13]  The sole purpose for such questions is to extract

---

[9] *See* Exhibit 6, Gary Wilson Application for Religious Accommodation.

[10] *Id*. at 1.

[11] *Id.*

[12] *See* Exhibit 7, Email from L. Vallejo-Valentino to G. Wilson (Nov. 29, 2021).

[13] EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, Part K.12 ("[T]he employer should ordinarily assume that an employee's request for religious

information necessary to justify a pretextual denial.  There was no legitimate intention of understanding Mr. Wilson's religious beliefs nor did it involve a good faith effort to reasonably accommodate him.  Everything relevant to the inquiry had already been included in his initial request form.

45.     On December 28, 2021, Mr. Wilson was informed by Shell that the company was "unable to grant [him] a permanent accommodation to continue working offshore unvaccinated" because of "undue hardship in the form of safety and costs related to the spread of COVID-19 on our offshore assets."[14]

46.     This was unsurprising, considering that Shell had already signaled that it was not going to accommodate religious employees.

47.     The accommodation denial did inform Mr. Wilson that the company would provide "a temporary accommodation of 60 days in which [he] would be able to continue working offshore unvaccinated" so long as he complied with mitigation measures.[15]

48.     Shell also informed Mr. Wilson that he was able to search for "alternate employment" within the company (because some divisions were not forcing vaccination on employees).[16]

---

accommodation is based on a sincerely held religious belief, practice, or observance.  However, if an employee requests a religious accommodation, and an employer is aware of facts that provide an objective basis for questioning either the religious nature or the sincerity of a particular belief, practice, or observance, the employer would be justified in requesting additional supporting information."), *available at* https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#A.

[14] Exhibit 3, Religious Accommodation Denial.

[15] *Id.*

[16] *Id.*

49.     On January 25, 2022, counsel sent a letter to Ms. Colette Hirstius, Senior Vice President for the Gulf of Mexico group at Shell Energy Resources (and copying HR workers in Shell Oil Company), seeking reconsideration of the accommodation denial on behalf of Mr. Wilson and several other Shell employees.  The letter provided a clear articulation of the legal standards applicable under Title VII, highlighting the fact that accommodating Mr. Wilson could be accomplished without cost to Shell in several different ways.[17]

50.     The letter also informed Shell that it would be in violation of Texas Executive Order GA-40, issued on October 11, 2021 to take an adverse employment action against Mr. Wilson based on his refusal of Shell's forced vaccination Policy since he was refusing the vaccine for religious reasons.[18]

51.     The letter went unacknowledged by Shell, and on March 3, 2022, Shell informed Mr. Wilson that he should "not report to work, including the 5-day hotel quarantine" required before traveling from Galveston to the Perdido.[19]

52.     Shell paid Mr. Wilson for his time up to then but then began withholding paychecks because he was missing hitches from Galveston out to the Perdido.

53.     While Shell informed Mr. Wilson that he was able to search for "alternate employment" within the company, that option was illusory.  When that happens in Shell, the division from which the employee transfers must accept any "severance risk" if the employee does not continue to work for Shell after their reassignment to a new division.  But when Mr. Wilson was able to secure a temporary job offering with Shell Penn Chemical, his own division—Gulf of

---

[17] *See* Exhibit 1, Letter from J. Sullivan, at 2–3.

[18] *Id.* at 3.

[19] Exhibit 8, Email from A. Rios to G. Wilson (Mar. 3, 2022).  The quarantines mentioned in the email would typically take place in Webster, Texas—30 miles north of Galveston—just prior to the hitch.

Mexico—would not accept the severance risk to let him work at Shell Penn (even though the Gulf of Mexico division allowed other employees to do that exact thing and maintained the severance risk for them).

54.     In the meantime, Mr. Wilson filed charges with the EEOC who reached out to Shell Oil for a Position Statement.

55.     Shell responded to the EEOC on May 20, 2022.[20]

56.     Shell terminated Mr. Wilson on May 20, 2022.[21]

57.     Because of Defendants' unlawful actions in terminating from a job he loved, Mr. Wilson has endured extreme emotional distress and continues to experience extreme emotional distress.

58.     After the EEOC was unsuccessful in resolving this case, a Notice of Right to Sue was issued to Mr. Wilson on March 29, 2023.[22]

### C. Reasonable Accommodation Options Unjustifiably Rejected by Shell

59.     Shell could have accommodated Mr. Wilson's sincere religious beliefs without undue hardship (indeed, with no cost whatsoever).  But Shell failed to engage in the interactive process to legitimately consider all possible accommodations.  This caused Shell to overlook accommodations posing less than a *de minimis* burden including: (1) acknowledging that Mr. Wilson's natural immunity satisfied Shell's immunization requirements (or, at least, the supposed reason behind it since natural immunity is superior to vaccine-induced immunity); (2) weekly

---

[20] Exhibit 9, Shell Position Statement to EEOC Regarding Charge of G. Wilson (May 20, 2022).

[21] Exhibit 10, Termination Email from A. Rios to G. Wilson (May 20, 2022).

[22] Exhibit 11, Notice of Right to Sue from EEOC to G. Wilson (Mar. 29, 2023).

testing for COVID-19; (3) masking and other enhanced safety protocols; or (4) any combination of the above.

60.     Critically, because of *demonstrated vaccine inefficacy* at the time, testing was a more reliable indication of safety than mandating vaccination.

61.     And Mr. Wilson would have personally incurred all costs related to COVID-19 testing.

62.     Regardless, as early as December 3, 2021, the White House had announced plans for full reimbursement of COVID-19 testing costs for employers.[23]

63.     On January 10, 2022—prior to Shell's mass termination scheme—President Biden's Department of Health and Human Services ("**HHS**") announced that as of January 15, 2022, all health insurers would be required to cover the **full cost of at-home COVID-19 testing**.[24]

64.     Tellingly, Shell did use some form of these accommodation measures to accommodate others who worked offshore for the company.

65.     At the time of Mr. Wilson's termination, the CDC had conclusively stated that individuals vaccinated for COVID-19 could nevertheless contract and spread COVID-19, which Shell cannot dispute.  On March 29, 2021, the Director of the CDC Rochelle Walensky publicly stated that the CDC's own data "suggests, you know, that vaccinated people do not carry the virus, don't get sick, and that it's not just in the clinical trials but it's also in real world data."[25]  However,

---

[23] *See* CNBC, *How to get the free at-home COVID tests promised by the White House,* (December 3, 2021) https://www.cnbc.com/2021/12/03/how-to-get-the-free-at-home-covid-tests-promised-by-white-house-.html (last visited June 5, 2023).

[24] *See* U.S. Department of Health and Human Services Press Release, *available at* https://www.hhs.gov/about/news/2022/01/10/biden-harris-administration-requires-insurance-companies-group-health-plans-to-cover-cost-at-home-covid-19-tests-increasing-access-free-tests.html (last visited June 8, 2023).

[25] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on* Rachel Maddow Show (March 29, 2021), *transcript available at* https://www.msnbc.com/transcripts/transcript-rachel-maddow-show-3-29-

because the real-world data already demonstrated breakthrough infections in the vaccinated just three months after the Pfizer-BioNTech vaccine received FDA approval, the CDC immediately thereafter clarified Director Walensky's statements and confirmed that vaccinated individuals do in fact become infected and spread the virus to others.[26]

66.    Before instituting the Policy, Shell knew or should have known that the vaccines were largely ineffective at controlling the spread of COVID-19.  As early as July 2021, Director Walensky admitted that the vaccinated had similarly high viral loads of SARS-CoV-2 as the unvaccinated and thus could still contract and spread the Delta variant.[27]  In August 2021, a joint study by CDC and the Wisconsin Department of Health services further confirmed Director Walensky's admission; the study indicated that vaccinated individuals had a 5% higher viral load than the unvaccinated and were not only just as likely to transmit the virus as the unvaccinated, but posed a greater contagion risk due to the increased likelihood of asymptomatic infection.[28]

67.    But underscoring the irrationality of Shell's continued pursuit of enforcing its mandate against religious employees, the company refused to recognize natural immunity as satisfying its immunization requirement.  This is despite the fact that the international scientific community has conclusively established through centuries of research that natural immunity is

---

21-n1262442?utm_content=buffer7fb12&utm_medium=Arianna&utm_source=LinkedIn&utm_campaign=Buffer.

[26] *See CDC Reverses Statement by Director* (Apr. 2, 2021), *available at* https://thehill.com/changing-america/well-being/546234-cdc-reverses-statement-by-director-that-vaccinated-people-are-no/.

[27] *Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR*, CDC News Room (July 30, 2021), *available at* https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html [https://perma.cc/VR5V-E67A] ("Today, some of those data were published in CDC's Morbidity and Mortality Weekly Report (MMWR), demonstrating that Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus.").

[28] *See* Kasen Riemersma, *et. al*, *Shedding of Infectious SARS-CoV-2 Despite Vaccination*, medRxiv (Aug. 24, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4.full.pdf.

superior to vaccine-elicited immunity.[29]  Even Dr. Anthony Fauci previously stated that prior infection is the most effective means of immunization.[30]  That should be unsurprising given that vaccine-based immunization is an artificial attempt to emulate the mechanisms of natural immunity.  This is a fundamental premise of immunological research, which, as a sophisticated international corporation, Shell was undoubtedly aware of when it terminated Mr. Wilson (and long before then, too).  In short, Shell's decision to ignore the possibility of natural immunity as satisfying the company's immunization requirement cannot be attributed to benign incompetence—it can only be attributed to ulterior motives such as rank religious discrimination.

68.    In the context of COVID-19, natural immunity's desirable relative efficacy has been repeatedly confirmed in the scientific literature.[31]  The company's own business records will demonstrate that its vaccinated employees were contracting COVID-19 at incredibly high rates during the relevant timeframes, likely at even higher rates than its unvaccinated employees who, like Mr. Wilson, possessed natural immunity.

69.    Further discovery here will also likely reveal that numerous Shell employees alerted management of the issues discussed above.

70.    In what should have been an unsurprising revelation, global data demonstrates that COVID-19 infection rates are higher among vaccinated individuals who do not possess natural immunity than unvaccinated individuals with natural immunity.[32]  This follows previous studies

---

[29] *See Plotkin's Vaccines*, 7th Edition, at Section 2.

[30] *See* https://www.youtube.com/watch?v=s8c_Py1wgGc (explaining that "the best vaccination is to get infected yourself") (last visited Oct. 8, 2022).

[31] *See, e.g.,* The Lancet, *Past SARS-CoV-2 infection protection against re-infection: a systematic review and meta-analysis* (Feb. 16, 2023), *available at* https://www.thelancet.com/article/S0140-6736(22)02465-5/fulltext.

[32] CDC Report, *supra* note 1 (noting that "[b]y October [of 2021], persons who survived a previous infection had lower case rates than persons who were vaccinated alone").

16

such as a Cleveland Clinic study published June 2021 that measured the cumulative incidence of SARS-CoV-2 infection among 52,238 vaccinated and unvaccinated health care workers over a five-month period, and found that none of the 1,359 previously infected who remained unvaccinated contracted SARS-CoV-2 over the course of the research, despite a high background rate of COVID-19 in the hospital.[33]  In a May 2021 study from Ireland, researchers conducted a review of 11 cohort studies involving over 600,000 total recovered COVID-19 patients who were followed up with for over 10 months and found that reinfection in all studies was "an uncommon event" and explained that there was "no study reporting an increase in the risk of reinfection over time."[34]

71.     On information and belief, at the time of Mr. Wilson's termination (and before), these facts relating to vaccinated persons and overall infection rates were available and known to Shell.  At the least, Shell should have made itself aware of such information prior to creating a forced medical treatment regime for its employees, particularly when it knew that the Policy was going to conflict with the religious beliefs of a large number of individuals in its workforce.

72.     At the time Shell imposed the Policy, up and through Mr. Wilson's termination, the COVID-19 vaccines were designed with the genetic sequencing of the original Wuhan strain of the SARS-CoV-2 virus, not the subsequent variants.  COVID-19 vaccines containing the genetic sequencing for variants did not become available until September 1, 2022—four months after Mr. Wilson's termination.[35]

---

[33] Nabin K. Shrestha, *et al.*, *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv (June 19, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.

[34] Eamon Murchu, *et al.*, *Quantifying the risk of SARS-CoV-2 reinfection over time*, Reviews of Medical Virology (May 27, 2021), *available at* https://pubmed.ncbi.nlm.nih.gov/34043841/.

[35] *See* CDC, *CDC Recommends the First Updated COVID-19 Booster*, *available at* https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html (last visited Oct. 8, 2022).

73.     At the time of Shell's Policy, the SARS-CoV-2 virus had mutated drastically from the original Wuhan strain (upon which the COVID-19 vaccines were designed) resulting in the B.1.617.2 variant ("**Delta**") becoming the globally dominant strain in June 2021, and later the B.1.1.529 variant ("**Omicron**") in December of 2021.[36]

74.     Delta has at least 13 mutations from the original Wuhan strain of SARS-CoV-2, impacting the ability for antibodies from prior SARS-CoV-2 variants, such as the Wuhan strain used in the COVID-19 vaccines, from neutralizing infection.[37]

75.     On information and belief, Shell's vaccinated employees contracted Delta at the same or greater rates than its unvaccinated employees during Delta's dominant period from June 2021 through November 2021.  Thus, Shell's continued pursuit of its compulsory vaccination policy for a vaccine that was already demonstrating dramatic inefficacy, shows that the policy was pretext to remove certain disfavored religious and disabled employees.

76.     On November 26, 2021, the WHO designated the B.1.1.529 variant ("Omicron") as a variant of concern, and by December 25, 2021, had become the dominant strain in the United States, accounting for 58.6% of all cases according to CDC data.[38]

---

[36] Berkely Lovelace, Jr., *WHO says delta is becoming the dominant Covid variant globally*, CNBC (June 18, 2021) https://www.cnbc.com/2021/06/18/who-says-delta-is-becoming-the-dominant-covid-variant-globally.html; Jorge Quarleri et al., *Omicron variant of the SARS-CoV-2: a quest to define the consequences of its high mutational load*, GeroScience at 53–56 (Feb. 2022) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8683309/; *U.S. CDC estimates Omicron variant to be 58.6% of cases, revises projection*, Reuters (Dec. 28, 2021) https://www.reuters.com/world/us/omicron-estimated-be-586-coronavirus-variants-us-cdc-2021-12-28/.

[37] *Expert reaction to cases of variant B.1.617 (the 'Indian variant') being investigated in the UK*, Science Media Centre (Apr. 19, 2021); https://www.sciencemediacentre.org/expert-reaction-to-cases-of-variant-b-1-617-the-indian-variant-being-investigated-in-the-uk/; *SARS-CoV-2 variants of concern as of 24 May 2021*, European Centre for Disease Prevention and Control, (Aug. 6, 2021) https://www.ecdc.europa.eu/en/covid-19/variants-concern.

[38] Jorge Quarleri et al., *Omicron variant of the SARS-CoV-2: a quest to define the consequences of its high mutational load*, GeroScience at 53-56 (Feb. 2022) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8683309/; *U.S. CDC estimates Omicron variant to be*

77.     Omicron has 50 mutations from the original Wuhan strain, 32 of which pertain to the spike protein, the very mechanism relied upon by the COVID-19 vaccines to neutralize the virus.[39]

78.     Thus, as recognized by the CDC, when Shell took adverse employment actions against Mr. Wilson, the company's policy was imposing an obsolete vaccine that did not prevent the dominant variant at the time (Omicron) and was particularly inferior to the protection conferred by natural immunity.[40]

79.     That was why other companies began suspending their mandated medical treatment programs after the Omicron variant displayed the inefficacy of the vaccines at the time.[41]

80.     And it had been known for some time that vaccine efficacy significantly wanes over time.  Indeed, the odds of an infection for individuals only vaccinated with a primary series was 13 times greater than for individuals with natural immunity.[42]

81.     These findings should not be surprising given that vaccines, by design, are an artificial attempt to emulate the immunity created by a natural infection.[43]  That is why vaccines

---

*58.6% of cases, revises projection*,  Reuters (Dec. 28, 2021), https://www.reuters.com/world/us/omicron-estimated-be-586-coronavirus-variants-us-cdc-2021-12-28/.

[39] Rekha Khandia et al., "*Emergence of SARS-CoV-2 Omicron (B.1.1.529) variant, salient features, high global health concerns and strategies to counter it amid ongoing COVID-19 pandemic*, Environmental Research (June 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8798788/.

[40] CDC Report, *supra* note 1 (noting that "[b]y October [of 2021], persons who survived a previous infection had lower case rates than persons who were vaccinated alone").

[41] *See United Airlines Rolls Back Vaccine Requirements for Employees*, The Texan (Mar. 14, 2022), https://thetexan.news/united-airlines-rolls-back-vaccine-requirements-for-employees/; Kate Gibson, *More big companies are dropping vaccine requirement for workers*, CBS News (Feb. 17, 2022), https://www.cbsnews.com/news/covid-19-vaccine-requirement-workers-adidas-intel-starbucks/.

[42] Sivan Gazit, *et al.*, *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, MEDRXIV [preprint] (Aug. 25, 2021), https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.

[43] *See* Plotkin's Vaccines, 7th Edition, at Section 2.

have never been able to achieve the same level of protection afforded by natural infection from a virus.[44]   Again, through centuries of research, the scientific community has confirmed that vaccines universally confer inferior immunity to having had the actual virus, and even the best vaccines do not confer immunity to all recipients.[45]   In those who do obtain simulated immunity from vaccination, the immunity created wanes over time,[46] as has been repeatedly demonstrated in the case of the COVID-19 vaccines.

82.     Moreover, Shell never required booster shots for its employees and thus did not force them to receive the additional vaccines that the CDC was recommending at the time.  Shell only required the outdated primary series of each vaccine—a poor substitute for natural immunity.  Given the odds of an infection being 13 times greater for those only vaccinated with a primary series, the vaccinated-but-unboosted employees Shell allowed to stay at work may have been *more* likely statistically to contract and transmit COVID-19 than individuals such as Mr. Wilson.

83.     While Shell may claim it was only "following the science," as relayed by the CDC, the evidence shows otherwise.  Not only did it ignore natural immunity after the CDC recognized it, the company did not institute a booster requirement for its employees, despite the CDC's recommendation that individuals receive booster shots.[47]

84.     And tellingly, the CDC never terminated any unvaccinated employee and stopped requiring the vaccine or even asking employees their COVID-19 vaccination status as of January 24, 2022.[48]

---

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *See* CDC Guidance on COVID-19 Boosters, *available at* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html.

[48] *See* Exhibit 12, CDC Response to FOIA Request (Dec. 2, 2022).

85.     Centuries of biomedical science conclusively prove the superiority of natural acquired immunity to that of vaccine-induced immunity.  Shell has yet to refute this fact, but can only cite to statements from the CDC saying that vaccination is still preferred.  The CDC issued a comprehensive set of guidance related to the pandemic, and it is apparent that Shell did not strictly adhere to this guidance.  Rather, it is clear Shell only selectively follows CDC guidance when doing so furthers its discriminatory policies.

86.     Recognizing Mr. Wilson's natural immunity to COVID-19 as an alternative to vaccination would have required no cost or action of Shell and would have imposed no logistical or administrative burden on the company.

87.     Nevertheless, despite the commonly understood scientific reality of natural immunity, Shell terminated Plaintiff while refusing to acknowledge his natural immunity as satisfying the Mandate. This obvious solution would have significantly decreased the number of religious employees terminated as a result of the Mandate. Recognition of natural immunity was an option that would have actually *saved Shell significant costs,* as it would have eliminated the costs associated with recruiting, training, and replacing the hundreds of terminated employees, and would have eliminated any purported costs associated with accommodating its naturally immune unvaccinated employees.

88.     Alternatively, periodic COVID-19 testing would also have been a costless accommodation.  As the CDC recognized in August of 2021, COVID-19 vaccines work "with regard to severe illness and death—they prevent it.  But what they can't do anymore is prevent

transmission."[49]  Yet someone who does not have COVID-19 cannot infect someone with COVID-19—thus testing was the safest option and one that Mr. Wilson was willing to do.

89.     To be sure, because vaccinated individuals may also contract and transmit COVID-19, a negative COVID-19 test is a more reliable indication of safety from the virus than a vaccination at some earlier time.  This fact was also well-known at the time Shell failed to accommodate Mr. Wilson and should have been considered as a reasonable accommodation to the vaccine mandate.

90.     Indeed, testing Mr. Wilson would have been much more efficacious with respect to safety since Shell was not testing the others traveling from Galveston to the Perdido.

91.     Having Mr. Wilson wear a mask was another possible reasonable accommodation.  As vaccine manufacturer Janssen (J&J) demonstrated, religiously exempt employees may be accommodated without increased risk or cost through masking.

92.     In short, multiple costless accommodations were available to Shell—and testing would have been an even safer option that what the company ended up going with: vax (with an outdated vaccine) and release (onto offshore assets without other mitigation measures in place).

93.     It seems likely that one or more of these accommodations was what Shell used to accommodate other employees in Mr. Wilson's position—including other individuals who worked on the Perdido and at similar offshore facilities.

## APPLICABLE LAW

94.     Title VII prohibits Shell from discriminating against employees based on their religion.  42 U.S.C. § 2000e-2(a)(1).  This "include[s] all aspects of religious observance and

---

[49] Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021), *available at* https://www.cnn.com/2021/08/05/health/us-coronavirus-thursday/index.html.

practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

95.     In other words, "[a]n employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees, but is not required to incur undue hardship." *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 273 (5th Cir. 2000).

96.     This allows a plaintiff to raise claims of religious discrimination under both a disparate treatment theory and a failure-to-accommodate theory.  *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1018 (4th Cir. 1996).

97.     Failure to engage the interactive process to find a solution for an exempt employee "is not an independent violation of Title VII.  But as a practical matter, such failure can have adverse legal consequences [because] where an employer has made no effort to act on an accommodation request, courts have found that the employer lacked the evidence needed to meet its burden of proof to establish that the plaintiff's proposed accommodation would actually have posed an undue hardship."  EEOC Guidance, *Section 12: Religious Discrimination*, Part 12-IV.A.2 (citing *EEOC v. Ithaca Indus., Inc.*, 849 F.2d 116, 118-19 (4th Cir. 1988) (finding that employer's failure to attempt to accommodate, absent any showing of undue hardship, violated Title VII)); *see also EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991) ("After failing to pursue . . . any other reasonable accommodation, the company is in no position to argue that it was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship on the conduct of its business.").

98.     Title VII also prohibits United from retaliating against an employee for engaging in protected activity.  *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).

99.     Additionally, preventing Mr. Wilson from working and then terminating him was a violation of Texas Executive Order GA-40, issued on October 11, 2021, because Shell is an "entity in Texas" that was "compel[ling] receipt of a COVID-19 vaccine" by an employee "who objects to such vaccination . . . based on a religious belief."

## CAUSES OF ACTION

### COUNT ONE:

### TITLE VII – RELIGIOUS DISCRIMINATION – FAILURE TO ACCOMMODATE
(42 U.S.C. § 2000e-2(a)(1))

100.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

101.    An employee may assert a claim under Title VII for his employer's failure to accommodate his sincere religious beliefs, so long as the accommodation does not impose undue hardship on the employer.  *See Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013).

102.    To establish a *prima facie* claim for failure to accommodate a plaintiff must present evidence that: "(1) 'that he had a *bona fide* religious belief that conflicted with an employment requirement'; (2) 'that he informed the employer of his belief'; and (3) 'that he was discharged for failing to comply with the conflicting employment requirement.'" *Id.* (quoting *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 273 (5th Cir. 2000)).

103.    Once the plaintiff has made out a *prima facie* case for discrimination, the burden shifts to the employer to show that it either reasonably accommodated the employee or that it could not have reasonably accommodated the plaintiff's religious needs without undue hardship. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68–69 (1986).

104.    "Whether an accommodation is reasonable is a question of fact." *Antoine*, 713 F.3d at 831 (citing *Turpen v. Mo.-Kan.-Tex. R.R. Co.*, 736 F.2d 1022, 1026 (5th Cir. 1984) ("We must

24

uphold the district court's factual determinations on the interlocking issues of 'reasonable accommodation' and 'undue hardship' unless they appear clearly erroneous.")).

105.    Mr. Wilson clearly established his "bona fide religious belief" and its conflict with the Policy when he submitted his religious accommodation request to Shell.  Because Mr. Wilson could not receive the COVID-19 vaccine without violating his religious beliefs, he could not comply with the Policy and was thus subject to adverse action through both unpaid leave and, ultimately, termination.  The company does not question his religious beliefs, and temporarily accommodated his beliefs, showing it had found his belief to be sincere and religious in nature and therefore qualifying for an accommodation under Title VII.

106.    Shell provided no reasonable accommodations options to Mr. Wilson, nor did it engage in the interactive process to attempt to find a workable accommodation that would not pose an undue hardship to the company.  Even if not a standalone claim, the failure to engage in a meaningful interactive process signals an employer's violation of its duty to accommodate because the employer is attempting to remain purposefully ignorant of potential reasonable accommodations.

107.    To establish the defense of "undue hardship," Shell must demonstrate that any of the aforesaid accommodations would "bear more than a de minimis cost" on the company.  *Hardison*, 432 U.S. at 84.  The above stated accommodations required no additional cost or logistical burden to Shell, as was seen when the company allowed others to continue working offshore who also held sincere religious beliefs that prevented them from taking the vaccine.

108.    Moreover, were the costs more than de minimus, Shell would not have been able to allow Mr. Wilson to continue working at any point—and especially not for two months following the company-imposed deadline.

25

109.   And after those two months—the height of the Omicron variant that caused other companies to suspend their mandated medical treatment programs[50]—it should have been apparent again that the cost to Shell in accommodating Mr. Wilson was zero.

110.   This is underscored by the fact that Shell disbanded its COVID-19 response team after the first two months of 2022.  Everyone knew the pandemic had (thankfully) subsided.

111.   The ability to provide reasonable accommodations to employees such as Mr. Wilson is also evident by considering other companies such as COVID-19 vaccine manufacturers J&J as well as the Centers for Disease Control—employers that were able to accommodate individuals with religious-based objections to mandatory COVID-19 vaccination policies.[51]

112.   If the CDC fired *zero* unvaccinated employees—and, indeed, *stopped even asking for employee vaccination status in January of 2022*—Shell is without excuse as to why it fired Mr. Wilson four months later and failed to follow federal employment law in doing so.[52]

113.   Title VII requires an employer to thoroughly consider all possible reasonable accommodations and not just reject requests out of hand with form denials.  "If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective."[53]  In the face of the reasonable options proposed here—and the fact that Shell presumably allowed testing/masking for some accommodated employees—the company cannot demonstrate even a *de minimis* burden in providing Mr. Wilson with a similar accommodation.

---

[50] *See* Note 41 *supra*.

[51] *See* Exhibit 2, Declaration of Donn Arizumi.

[52] *See* Exhibit 12, CDC Response to FOIA Request.

[53] EEOC Guidance Section 12: Religious Discrimination; Part IV, A.2.

114.    As noted above, it is undisputed that someone cannot catch COVID-19 from someone who does not have COVID-19.  A negative COVID-19 test would have confirmed that Mr. Wilson was less of a contagion hazard than untested individuals who were vaccinated at some earlier point in time but who could still contract and transmit COVID-19.

115.    But in denying Mr. Wilson's request, Shell blankly asserted "undue hardship" and provided no justification as to why or how clearly available options could not be undertaken without undue hardship.  This is especially true where recognition of Mr. Wilson's natural immunity (for example) required no cost, effort, or operational change to the status quo (as seen in Shell's own documents).

116.    Moreover, Shell was on actual of notice both the many possible accommodation options for Mr. Wilson and the fact that the failure to use one of them would result in a Title VII violation.[54]   Nonetheless, Shell forged forward with its campaign to eliminate its religious employees like Mr. Wilson.

117.    But, of course, Shell did find a way to accommodate many employees who did not share Mr. Wilson's religious characteristics—including employees who also worked on the Perdido.

118.    Therefore, Shell unlawfully discriminated against Mr. Wilson based on his sincerely religious beliefs by failing to accommodate those beliefs.  Shell cannot demonstrate that doing so would have imposed *any* hardship, let alone undue hardship.

119.    Shell's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Plaintiff's Title VII rights—especially since the company was on notice of its legal errors prior to taking an adverse employment action against Mr. Wilson.

---

[54] *See* Exhibit 1, Letter from J. Sullivan.

120.     As a direct and proximate consequence of Shell's discriminatory conduct, Mr. Wilson has suffered and is suffering economic and pecuniary damages for which he is entitled to judgment.

121.     In addition, as a direct and proximate consequence of Shell's actions, Mr. Wilson has suffered and is suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which he is entitled to recover compensatory damages in an amount to be determined by the jury.

122.     Accordingly, Plaintiff requests relief as hereinafter described.

## COUNT TWO:
## TITLE VII - RELIGIOUS DISCRIMINATION - DISPARATE TREATMENT
(42 U.S.C. § 2000e-2(a)(1))

123.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

124.     Title VII makes it "an unlawful employment practice for an employer to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

125.     A *prima facie* case for disparate treatment requires an "adverse employment action" taken against a plaintiff "because of her protected status."  *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019).

126.     A plaintiff asserting a prima facie case for disparate treatment can do so through either direct or circumstantial evidence.  *See id.*

127.     By requesting religious accommodation from Shell—specifically outlining how the Policy conflicted with his sincerely held religious beliefs—Mr. Wilson established himself as a

member of a protected class.  *See generally* Title VII (noting protection for religious beliefs).  Shell implicitly acknowledged that Mr. Wilson was a member of a protected class here by considering and rejecting his religious accommodation request, only providing a temporary accommodation to his stated religious conflict.

128.    Mr. Wilson's annual reports and top-level bonuses demonstrate that he was qualified for the position.  Moreover, prior to the Policy, Mr. Wilson had worked without incident throughout the pandemic and had no indication from the company that his job was in jeopardy.  Simply put, he was an exceptional employee who rose to become a high-level earner in the company—were it not for Shell's unlawful application of its Policy, Mr. Wilson would still be working there.

129.    Mr. Wilson first suffered an adverse employment action when Shell placed him on unpaid leave (by preventing him from catching his "hitches" out of Galveston to the Perdido).  He suffered an additional adverse employment action when Shell terminated him after he, on religious grounds, declined to take the COVID-19 vaccine by the end of the unpaid leave period.

130.    Shell claims that it could not accommodate Mr. Wilson without undue hardship, yet he could have been accommodated effortlessly through masking/testing (like vaccine manufacturer J&J did), recognition of his natural immunity (like countries throughout the European Union), or any combination of these options.

131.    At the same time Shell was discriminating against Mr. Wilson, though, the company knew that vaccinated employees were contracting and spreading COVID-19.  Yet counter to the supposed "workplace safety" justification, Shell *relaxed* safety protocols for vaccinated secular employees who were contracting and spreading the virus while simultaneously insisting that exempt employees abandon their religious beliefs.   Religious employees who were

immunized (naturally) were terminated.  Secular employees who were immunized artificially were allowed to keep their jobs, and, counterintuitively, invasive safety protocols were relaxed for those same secular employees and imposed on religious employees before they were ultimately terminated.

132.    Even more tellingly, Shell knew—prior to terminating Mr. Wilson's employment in May of 2022—that the COVID-19 pandemic had subsided and there was not even a conceivable basis for forced medical treatments at that point, especially one Shell knew would violate many of its employees' religious beliefs.  After all, even prior to suspending Mr. Wilson from work in March of 2022, Shell had already disbanded its COVID-19 response working group.[55]

133.    The Policy, without lawful or rational justification, was thus punitive toward religious employees like Mr. Wilson who should have been accommodated because they were naturally immune to the virus and were less of a risk to others than the vaccinated secular employees who had not previously contracted COVID-19.  Shell ultimately treated religious employees like Mr. Wilson worse because they had a religious reason for not taking a vaccine.  (A truly preventative policy would have required something such as masking and testing for all employees, especially those who had not previously recovered from a COVID-19 infection *even if they were vaccinated*.)

134.    Effectively, Shell required naturally immune religious employees, like Mr. Wilson, to possess hybrid immunity (vaccine-based immunity + natural immunity) yet did not require any type of enhanced safety protocols for its secular vaccinated employees.  Again, Shell relaxed safety protocols for its secular employees at a time it was clear that they could contract and spread COVID-19 (and, indeed, were doing so).

---

[55] *See* Exhibit 4, Email from G. Watkins.

135.    Shell required hybrid immunity for Mr. Wilson and subjected him to heightened safety protocols because of his religious beliefs.  Shell relaxed safety protocols on its secular vaccinated employees because it favored their non-religious beliefs.  Shell rewarded secular vaccinated employees, even though they presented an equal or greater contagion hazard relative to religious naturally immune employees like Mr. Wilson, because the company favored these secular employees' views.

136.    Moreover, Shell took action on enforcing its policy with the full knowledge that it would adversely affect religious employees disproportionately.

137.    Additionally, Shell's religious sincerity evaluation—disguised as an innocent inquiry for more information—attempted to set Mr. Wilson apart based on his faith and beliefs, and was thus an additional instance of direct disparate treatment.  Evidently Shell needed to know which denomination Mr. Wilson belonged to in order to determine if he was of the "correct" variety to obtain an accommodation.  After all, other similarly-situated unvaccinated employees were accommodated.  Whether it was for secular reasons or for particular religious reasons, Shell will be unable to explain why those employees received favorable treatment that could not also be extended to Mr. Wilson.

138.    Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311 (1996); *Cicalese*, 924 F.3d at 766.

139.    Once the employer meets that burden, the plaintiff must then prove that the proffered reason was mere pretext and that discrimination was the real reason for the adverse employment action.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).

140.   Any non-discriminatory reason proffered by Shell is pretextual.  By allowing vaccinated employees to avoid necessary preventative measures, while not even allowing exempt employees like Mr. Wilson to use them, Shell undermines any legitimate nondiscriminatory reason relating to workplace safety for failing to accommodate Mr. Wilson.

141.   If Shell's justification truly was to help provide for a safe work environment during the COVID-19 pandemic and safeguard the health and safety of employees, the company would not have singled out those who had natural immunity for worse treatment because they could not take the vaccine for religious reasons.  Additionally, accommodated unvaccinated individuals throughout the company undermine any claim that 100% vaccination was absolutely necessary for any safety goal—accommodations were possible, and the safety argument is pretext.

142.   And inquiring as to Mr. Wilson's denomination—a fact that had zero bearing on *his* sincerely held religious beliefs that the company was already in possession of—indicates that the Shell was not operating in good faith but, instead, looking to extract evidence against Mr. Wilson that it would use to deny his request.

143.   Critically, if Mr. Wilson had some other reason for being unable to take the vaccine, Shell likely would have accommodated him (as it did with other employees on his asset and at other offshore locations).

144.   Considering these factors, a strong inference of intentional religious discrimination has been raised, and any non-discriminatory reason asserted by Shell is inauthentic.

145.   Shell's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Plaintiff's Title VII rights.

32

146.     As a direct and proximate consequence of Shell's discriminatory conduct, Mr. Wilson has suffered and is suffering economic and pecuniary damages for which he is entitled to judgment.

147.     In addition, as a direct and proximate consequence of Shell's actions, Mr. Wilson has suffered and is suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which he is entitled to recover compensatory damages in an amount to be determined by the jury.

148.     Accordingly, Plaintiff requests relief as hereinafter described.

**COUNT THREE:**

**TITLE VII – RETALIATION**
(42 U.S.C. §2000e-3(a))

149.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

150.     Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because [s]he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a).

151.     A *prima facie* case for retaliation requires a showing that (1) the employee engaged in activity protected by Title VII; (2) that an adverse employment action was taken by the employer; and (3) that a causal link existed between the protected activity and the adverse action. *Ackel v. Nat'l Comms., Inc.*, 339 F.3d 376, 385 (5th Cir. 2003).

152.     Here, Mr. Wilson engaged in protected activity under Title VII when he sought a religious accommodation from the Policy that would otherwise require him to violate his sincere religious beliefs.

153.     He also continued to oppose Shell's unlawful practice through his formal termination (during the time others similarly situated were being returned to work with accommodations) and filed a Charge with the EEOC.

154.     After denying Mr. Wilson's request, Shell pressured him to capitulate and get the COVID-19 vaccine with false the information that the company could not accommodate his beliefs.  Shell then placed him on unpaid leave—a further coercive technique—only to terminate him at the end of the set period of unpaid leave.

155.     On information and belief, Shell imposed the period of unpaid leave with the intent to punish and pressure those who sought religious accommodation; Shell hoped that the constant reminder of termination would result in them abandoning their religious beliefs and surrendering to a coerced injection of a COVID-19 vaccine.

156.     Shell's Policy forced those who were denied religious accommodations into a period of extreme emotional and psychological distress, seeking to coerce religious employees into compliance.

157.     But for his request for religious accommodation, Mr. Wilson would not have experienced the psychological and emotional distress from the period of unpaid leave where he was constantly pressured to violate his religious beliefs.

158.     Shell also terminated Mr. Wilson for seeking a religious accommodation to its compulsory vaccination policy.  Mr. Wilson maintained his request for an accommodation through the date of his termination, renewing his request implicitly each day that passed, through May 20, 2022.  Shell terminated Mr. Wilson in close temporal proximity to his requesting a religious accommodation and seeking to enforce his rights through the EEOC.

159.    Further evidence of the retaliation against Mr. Wilson was that, while Shell informed Mr. Wilson that he was able to search for "alternate employment" within the company, his division took that opportunity away from him (even though it granted it to others).  Mr. Wilson engaged in a search throughout the company during the months of January, February, and March. When he was able to secure a temporary job offering with Shell Penn Chemical, his division— Gulf of Mexico—would not accept the severance risk to let him work at Shell Penn and thus secure "alternate employment" within Shell.

160.    Separately, Shell refused to admit its mistake and bring Mr. Wilson back even after it became apparent that (1) accommodations were available; (2) the COVID-19 vaccines were not preventing contraction of the virus; (3) individuals with natural immunity possessed superior immunity to those with the vaccine only; and (4) the pandemic had ended (or at least meaningfully receded).  Such actions were due to Mr. Wilson's opposing of Shell's illegal employment law practice.

161.    In particular, Shell could have returned Mr. Wilson to work at any point in the Spring of 2022—when it was allowing other unvaccinated employees to have accommodations and when it was clear that its forced medical treatment Policy was, at the least, impotent.  Yet Shell remained entrenched against Mr. Wilson because he already had a pending EEOC case against the company.

162.    Indeed, Shell filed a Position Statement against Mr. Wilson on the same day he was terminated.  Rather than mere coincidence, this underscores the fact that Shell was retaliating against Mr. Wilson in violation of Title VII.

163.    Shell's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Plaintiff's Title VII rights.

164.     As a direct and proximate consequence of Shell's retaliatory conduct, Mr. Wilson has suffered and is suffering economic and pecuniary damages for which he is entitled to judgment.

165.     In addition, as a direct and proximate consequence of Shell's actions, Mr. Wilson has suffered and is suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which he is entitled to recover compensatory damages in an amount to be determined by the jury.

166.     Accordingly, Plaintiff requests relief as hereinafter described.

## COUNT FOUR:
## WRONGFUL TERMINATION
(Texas State Law)

167.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

168.     Texas Executive Order GA-40—issued on October 11, 2021, prior to the institution of Shell's mandate—states: "No entity in Texas can compel receipt of a COVID-19 vaccine by any individual, including an employee . . . who objects to such vaccination . . . based on a religious belief."

169.     The EO goes on to state that such violations are punishable by the "maximum fine" of $1000 under Texas Government Code § 418.173, but that the Government Code's provision for up to 180 days of jail time is not available for violations of this law.

170.     Courts have thus recognized that, "under at least Texas and Florida law, [COVID-19] vaccination cannot be mandatory.  Tex. Executive Order GA-40 (Oct. 11, 2021)." *Children's Health Defense v. FDA*, --- F.Supp.3d ---, 2023 WL 175004, at *5 (W.D. Tex. Jan. 12, 2023); *see also Texas v. Becerra*, --- F.Supp.3d ---, 2023 WL 2754350, at *9 (N.D. Tex. Mar. 31, 2023) ("Texas issued Executive Orders GA-38, GA-39, and GA-40, which prohibit state agencies,

36

political subdivisions, and any public or private entity in Texas from requiring a person to receive a COVID-19 vaccine.").

171.    Defendants here are unquestionably "entities in Texas."   Shell Oil and Shell Exploration & Production are headquartered in Houston, Texas and Mr. Wilson received his paycheck from the company's Houston address.   Likewise, though Shell Energy Resources appears to be headquartered in Louisiana, it is a foreign for-profit corporation in Texas, registered with the Secretary of State.   Shell Energy's legal status in the state makes the EO applicable to that entity as well.

172.    Because Defendants are entities in Texas, they were prohibited under Texas law from mandating that Mr. Wilson receive a COVID-19 vaccine.

173.    Defendants nevertheless flaunted their legal duty and then took employment action against Mr. Wilson when he declined to go along with their coercion.

174.    While Texas is an "at will" employment state, that status may always be altered by state law.   Here, the Executive Order—which has "the force and effect of law" under Texas Government Code § 418.012—removes Shell's option to take adverse employment actions against unvaccinated workers who cannot take the vaccine for religious reasons (a point Shell does not dispute with Mr. Wilson).

175.    And to be sure, a violation of state law is—*per se*—a violation of public policy, an exception to the at-will doctrine in Texas.

176.    As a result, his termination was unlawful and he must be made whole for Shell's violation of Texas law.

177.    Shell's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for Plaintiff's rights under Texas law—especially given that the company was on notice that its actions violated the law prior to taking any adverse employment action against Mr. Wilson.

178.     As a direct and proximate consequence of Shell's discriminatory conduct, Mr. Wilson has suffered and is suffering economic and pecuniary damages for which he is entitled to judgment.

179.    In addition, as a direct and proximate consequence of Shell's unlawful actions under Texas law, Mr. Wilson has suffered and is suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which he is entitled to recover compensatory damages in an amount to be determined by the jury.

180.    Accordingly, Plaintiff requests relief as hereinafter described.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, awarding relief as follows:

(i)    Declare Shell violated Title VII by failing to engage in the interactive process in response to Mr. Wilson's request for accommodations to its Policy and, instead, preemptively denying his request based on pretextual reasons;

(ii)    Declare Shell violated Title VII for its failure to provide a reasonable accommodation to Mr. Wilson's clearly articulated religious beliefs when numerous no-cost options were available;

(iii)    Declare that Shell's disparate treatment of religious employees—in allowing secular employees to work without effective mitigation measures—such as

testing—while simultaneously rejecting religious employees' accommodations requests constitutes religious discrimination in violation of Title VII;

(iv)   Declare that Shell violated Title VII by retaliating against Mr. Wilson for engaging in protected activity through seeking religious accommodation and filing an EEOC charge against the company;

(v)    Declare that Shell violated Texas state law by compelling vaccination despite a religious belief to the contrary and then terminating Mr. Wilson for refusing to comply because of his religious beliefs;

(vi)   Award Mr. Wilson damages, including back pay, front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages and other affirmative relief necessary to eradicate the effects of Shell's unlawful employment practices;

(vii)  Award Mr. Wilson damages necessary to make him whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, including but not limited to emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and loss of civil rights, in an amount to be determined at trial;

(viii) Award reasonable attorneys' fees and costs; and

(ix)   Grant any other relief that the Court deems just and proper;

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all counts so triable.

Dated: June 26, 2023

Respectfully submitted,

/s/ *John C. Sullivan*
John C. Sullivan
Attorney-in-Charge
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX  75104
Phone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

Walker D. Moller*
**SIRI & GLIMSTAD LLP**
501 Congress Avenue
Suite 150 – #343
Austin, TX 78701
Phone: (512) 265-5622
Fax: (646) 417-5967
wmoller@sirillp.com

* Application for pro hac vice forthcoming


*Attorneys for Plaintiff*